### William Mace *v.* The State.

Charge of the Court — Presumption of Innocence, and Reasonable Doubt. — In a trial for murder, the defendant asked the court to charge the jury that "the accused must be presumed innocent until his guilt is established by legal evidence; and in case of a reasonable doubt as to his guilt, he is entitled to be acquitted." *Held,* that the charge asked is substantially in the language of the Code, and it was error to refuse it, when not already given in the general charge.

Appeal from the District Court of Tom Green. Tried below before the Hon. A. Blacker.

The appellant, with eight others, was charged by indictment with the murder of Frederick Yunt, in Tom Green County, on the fourteenth day of February, 1878. Being alone tried, he was convicted of murder in the first degree.

According to the testimony of J. M. Morris, the first witness introduced by the State, the defendant, who was a United States soldier, came into his (witness's) saloon, in St. Angelo, Tom Green County, early in the evening on the night of the killing. He left the saloon shortly afterwards, going to roll-call, between eight and nine o'clock, and returned to the saloon between nine and ten o'clock, in company with several other soldiers, among whom witness noticed David Young, Tom Russell, Charles West, and others. A difficulty came up between the soldiers and one Monday. The defendant came up to witness and said that Monday was trying to raise a difficulty with them. About this time Monday came into the saloon, cursing and swearing, and saying that he wanted his pistol, which was behind witness's counter, in charge of the bar-keeper, Mr. Nichol-

son. Monday made a rush in the direction of the counter, saying that he would just as soon die then as at any other time, or words to that effect. The witness at the same time heard a voice from the group of soldiers say, " Shoot him," and heard the defendant say, " Knock him down." Defendant had a six-shooter pistol in his hand at the time, which the witness attempted to take from him, advising him at the same time to have no difficulty. He answered that he did not want to hurt witness, and that if witness wanted to save himself, he had best leave the house; which witness did immediately.

As witness left the house, firing commenced within. When witness left, the deceased was sitting at a table, playing cards. When he presently returned, deceased was lying dead on the floor, near the stove. One gunshot had struck him in the arm, one had penetrated his groin, and one his head, from which last wound the brain was oozing. There had been a quarrel between the soldiers and one Jack Brown, just before roll-call; but the deceased, who was a peaceable, quiet man, took no part in it. So far as the witness knows, there had been no quarrel between the deceased and the soldiers up to the time of the killing.

A. A. Rhodes, next introduced for the State, testified that he was in Morris's saloon on the night of the killing. The first intimation he had of the difficulty was derived from a remark of defendant to Monday. He heard the former say to the latter, " If you say so, you are a d—d son of a b—h." Monday then remarked to witness, " That's hard to take," when witness suggested to him to go to bed; and the two (Monday and witness) started towards the front of the door. Monday turned and said, " I had as lief die now as at any time," and started behind the bar after his pistol. Morris and the bar-keeper would not let him have it. Defendant, Young, and Russell followed Monday, drawing their pistols, and witness heard one of them say, " Shoot him," and also heard defendant say, " Knock him down," as he (defendant) at the same time

shot at him. As he fell, defendant waved his pistol over his head, and said, "We are ready for you." Young shot at Monday; Nicholson (the bar-keeper) shot at Young, and defendant shot at, or towards, Nicholson. The soldiers then ran out at the back door, and in two or three minutes seven soldiers appeared at the front and back doors, and commenced shooting into the house with carbines. Witness saw a soldier — does not know who — step up to the back door and shoot in, when the deceased fell off from a table upon which he had been sitting. Deceased took no part in the difficulty; was a peaceable, quiet man, and had no quarrel with the soldiers.

Joe Johnson next testified for the State. Himself and John Gilmer occupied a room in the rear of the building in which Morris's saloon was situated. They were in this room on the night of the killing. They heard shooting in the bar-room, and afterwards in the rear of the bar-room. Witness tried to get out when the shooting commenced, but was prevented by Gilmer. The two finally left the room together, when Gilmer ran off, and was shot at while running. Witness could easily see into the bar-room from the room which he occupied. He saw defendant and two other soldiers come into the room, and at the same time noticed that deceased was lying on the floor, near the stove. The lamps had been knocked down, and the oil was burning on the floor. Saw defendant (whom he had known two years) and two other soldiers come into the room, and saw defendant put a carbine to the deceased's head while he was lying on the floor. Saw him shoot, and then saw him and the other two soldiers run out.

James Johnson, for the State, testified that he occupied a room in the "corral" back of Morris's saloon. On the night of the killing he heard some shooting about the saloon. He stepped out of his room, and saw defendant and two other soldiers in the rear of the saloon. He presently saw defendant step up to the door and shoot in. He then heard defendant say to the other two, " I have killed one son of a

b—h, and I will get two or three more." Witness then ran off.

Elihu Ross, a freedman, who testified for the State, occupied room No. 2, in the rear of the saloon. When he heard the firing commence he ran to the door, and saw two or three men in the saloon with carbines, and saw one man lying on the floor. The light was dim, and he could recognize none of the parties. Saw a man step up to the man lying on the floor, place his gun to his head, and shoot. Could not recognize the man by the poor light. Has known the defendant well.

Henry Williams testified that he was across the street, at Mr. Wilson's, when the firing commenced. Mr. Wilson told him to go over to the saloon and bring a trunk from there, of his. Witness went, and, on entering, found the lamp knocked down and the floor on fire. Saw deceased lying on the floor, and asked him why he did not leave there; and he said that he was wounded and could not walk. Witness told him, then, that as soon as he had put out the fire he would help him. While he was working over the fire, three men came in. Witness recognized none of them. Presently he heard a shot behind him, and, turning, saw that one of the three men had shot and killed the deceased. Witness, being blinded by the smoke and the bright light over which he was working, could not recognize the men, but thought he recognized as defendant's the voice that said, " Let's go over to Wilson's and look for " — some one whose name witness did not catch. The three men then ran out of the house. Has known defendant about two years, and has heard him talk a great deal. He is a man who talks a great deal.

William Leffler testified, for the State, that he is a soldier, and knows the military regulations. Soldiers off duty are not allowed to bear arms. Some two or three days after the killing, he heard defendant say, " We killed two of them, and they got two of us, which made a stand-off."

No brief for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J.    The appellant, who was tried alone, and convicted of murder in the first degree, was indicted, with eight others, for the murder of one Frederick Yunt, alleged to have been committed in Tom Green County, on February 14, 1878.

The appellant is not represented here in person or by counsel, by brief or otherwise.    We find, upon an examination of the record, that on the trial below, the defendant, by his counsel, requested the court to instruct the jury to this effect: "The accused must be presumed innocent until his guilt is established by legal evidence, and, in case of a reasonable doubt as to his guilt, he is entitled to be acquitted;" which was refused by the court, and the refusal is complained of in a motion for a new trial.

The charge asked and refused is substantially in the language of the Code of Criminal Procedure, art. 640, and it was error in the court to refuse it.    *Black* v. *The State*, 1 Texas Ct. App. 368; *Hampton* v. *The State*, 1 Texas Ct. App. 652, and many later cases.

The charge asked and refused embraces two propositions of law, as does the article of the Code upon which the charge was based: 1. A defendant in a criminal cause is presumed to be innocent until his guilt is established by legal evidence. 2. In case of reasonable doubt as to his guilt, he is entitled to be acquitted.    On this article rests the law of the *presumption of innocence* and of *reasonable doubt*.

The latter proposition was embraced in the charge, but the former was not; and because of error in refusing to give the charge on this subject, after having been requested to do so, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*